**SIGNED this 2 day of March, 2023.**



**James P. Smith**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| In the Matter of: | : | Chapter 13 |
| | : | |
| BRANDON DANIEL COLQUITT AND | : | Case No. 21-30235-JPS |
| DANA LOREN COLQUITT | : | |
| | : | |
| Debtors | : | |
| | : | |
| THE COMMERCIAL BANK | : | |
| | : | |
| Plaintiff | : | |
| vs. | : | Adversary Proceeding |
| | : | No. 21-3010-JPS |
| BRANDON DANIEL COLQUITT, | : | |
| | : | |
| Defendant | : | |

BEFORE

James P. Smith
United States Bankruptcy Judge

APPEARANCE:

      For Plaintiff:                Roy E. Manoll, III
Fortson, Bentley and Griffin, PA
2500 Daniell's Bridge Road
Building 200, Suite 3A
Athens, GA 30606
706-548-1151
Email: rem@fbglaw.com

      For Defendant:              Adam M. Cain
Law Offices of Adam M. Cain, LLC
P.O. Box 193
Watkinsville, GA 30677
706-206-7310
Fax : 866-923-3732
Email: amcain@adamcainlaw.com

                                     Courtney Davis
Morgan & Morgan Attorneys at Law, P.C.
1090 C Founders Blvd
Athens, GA 30606
706-548-7070
Fax : 706-613-2089
Email: courtney@morganlawyers.com

## MEMORANDUM OPINION

In this adversary proceeding, Plaintiff seeks a determination that Defendant participated in a check kiting scheme and that his debt is nondischargeable under 11 U.S.C. §523 (a)(2)(A).[1] This matter came on for trial on October 24, 2022.  The Court has considered the evidence presented, including the testimony of the witnesses and Defendant's deposition,[2] counsel's proposed findings of fact and conclusions of law, and the applicable law. The Court now publishes its findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## FINDINGS OF FACTS

Defendant and Jake Hill were long-time friends and former roommates. Hill asked Defendant to help finance a concrete business, Hill Construction, owned by Hill. Defendant agreed and, in late 2016, began making short-term loans to Hill. Defendant's loans were working capital loans, to be used by Hill to purchase materials, with Hill supplying the labor. There was a 30% markup on both the materials and labor. Defendant prepared a one-page Loan Agreement for each loan that included the loan amount, Defendant's profit and the repayment date. Defendant's profit averaged 30% of the loan amount. The repayment term varied from three to about thirty days.

The same day that Defendant and Hill signed a Loan Agreement, Defendant would issue a check for the loan payable to Hill or Hill Construction which was then deposited into Hill's

---

[1]Plaintiff announced at trial that it was abandoning its claim of nondischargeability under 11 U.S.C. §523 (a)(4).

[2]Defendant's deposition was admitted into evidence at trial without objection. See Plaintiff's Exhibit 13.

checking account. To repay the loan, Hill issued a check payable to Defendant which was then deposited into Defendant's account.

Hill and Defendant maintained their checking accounts at different banks. Hill's account[3] was always at Union Bank. Defendant's account was initially at SunTrust Bank. On June 9, 2017 Defendant opened an account[4] with Plaintiff to use primarily for his loan transactions with Hill.[5] Also on June 9, 2017, Defendant obtained a loan for $40,000 from Plaintiff and used the proceeds to make loans to Hill.  Almost every deposit into Defendant's account came from Hill's repayment checks and all withdrawals were either loan checks to Hill or withdrawals by Defendant to pay for his personal expenses.

Between June 9 and December 7, 2017, Defendant and Hill signed around forty-five Loan Agreements, sometimes signing several on the same day.[6] Multiple loan and repayment checks were sometimes issued and deposited the same day. During the relationship there were many days when the total amount of deposits for a particular day almost equaled the amount of withdrawals for that same day. Although Defendant suggested to Hill that he write a single repayment check for several loans, Hill wanted to issue a separate repayment check for each loan

---

[3] The names on Hill's checks were Hill Construction
Jake Hill or Misti Hill

[4] The names on Defendant's checks were Brandon Colquitt
Dana Colquitt

[5] Although copies of Defendant's bank statements for his account with Plaintiff were introduced at trial, none of Hill's bank statements were introduced. Nor was Hill called to testify at trial.

[6] In addition, Defendant and Hill signed at least seven Loan Agreements prior to June 9, 2017.

so that he could keep each job separate.

During the first three months after opening his account with Plaintiff, June 15 through

September 15, 2017, the number of transactions were relatively small and deposits and

withdrawals were approximately $115, 800 or less each month. From September 15, 2017 to

October 15, 2017, deposits totaled $46,136 and withdraws totaled $40,113. However, in

November and December 2017, both the number of transactions and the amount of deposits

increased significantly. From October 15, 2017 through November 15, 2017, deposits totaled

$1,243,990.01 and withdrawals totaled $1,195,639.13. From November 15, 2017 through

December15, 2017, deposits totaled $2,115,802.07 and withdrawals totaled $2,176,546.16.

In 2017, Defendant worked full-time for a fixture installation company and sometimes

traveled out-of-town. In those instances, Defendant's wife sometimes signed, with Defendant's

permission, the Loan Agreements and loan checks.

During the times he was making loans to Hill, Defendant and Frank Moore (his boss, who

was also making loans to Hill) visited several driveway jobs and one retaining wall job done by

Hill. Defendant did not know where Hill had purchased materials with the loan proceeds and he

did not see any purchase receipts. While Hill sometimes provided Defendant purchase orders for

jobs he was supposedly doing for Lamar, a billboard company, Defendant subsequently

discovered that Hill had never done any jobs for Lamar.

On November 28, 2017, a loan repayment check for $120,000 from Hill was deposited

into Defendant's account with Plaintiff. Defendant was out-of-town at the time. That same day,

Defendant's wife and Hill signed a Loan Agreement for a loan for $116,000. Defendant called

Plaintiff and asked its executive vice president and chief operations officer, Andy Thomas, if he

could get a cashier's check for $116,000 to give to Hill since he was out-of town. Thomas agreed

to do so, but told Defendant he would be ultimately responsible if Hill's $120,00 check was

dishonored. The check ultimately cleared Hill's account.

On December 6 or 7, 2017, Hill came to Plaintiff and deposited three checks totaling

$550,000 into Defendant's account.[7] Defendant was again out-of-town. Defendant's wife and

Hill signed four Loan Agreements dated December 7, 2017, totaling $535,000. Defendant

believed that the loans were to be used by Hill on jobs repairing storm damage to Lamar's

signage. The next day, December 8, 2017, Defendant called Plaintiff and talked with Sheryl

Clark, the highest ranking person in the bank that day. Defendant asked Clark if the $550,000

either was "available"[8] or "was good funds to write a cashier's check for 535 off of."[9] A few

minutes later, Clark called Defendant back and told him "we can do it."[10] Defendant asked Clark

to prepare a cashier's check for $535,000 payable to Hill for Hill to pick up. Clark prepared the

check and Hill picked it up that same day. The $535,000 was debited against Defendant's

account on December 8, 2017. The cashier's check cleared Plaintiff on Monday, December 11,

2017. Hill's three checks totaling $550,000 were dishonored by Union Bank and returned to

Plaintiff for insufficient funds on Friday, December 15, 2017.[11] The same day, Plaintiff charged

---

[7]Defendant believes this deposit was made late in the afternoon of December 6 and was credited to his account on the next day.

[8]Oral Trial Transcript at 10:4 (hereinafter "Oral Tr."). Sheryl Clark was not called to testify at trial.

[9]Defendant Jan. 11, 2019 Dep. 26:10-12, Plaintiff's Exhibit 13 (hereinafter "Dep.").

[10]Dep. 27:16-20.

[11] Thomas explained the time lag between the day the checks were deposited and the day they were returned by stating that Plaintiff usually sends a returned check back a second

back $550,000 to Defendant's account which caused his account to be overdrawn by about

$440,000.

Shortly after Hill's checks were dishonored, Thomas called Defendant and asked him to

talk with Hill and see why his checks had been returned. Defendant contacted Hill who explained

that he had received a bad check for $460,000. On December 20, 2017, Hill wire transferred

$43,000 to Plaintiff which was deposited into and credited to Defendant's account.[12]

Defendant met with Thomas and his supervisor, Mike Sale, at the bank. Thomas had by

then also talked with Hill and may have talked with someone at Hill's bank. Thomas believed

that Hill's dishonored checks would be satisfied within a few weeks. Thomas told Defendant that

his account could not go into the new year with a negative balance. At Thomas' request,

Defendant signed a promissory note and security agreement for $397,077.07 to clear the

overdrawn balance. The note's maturity date was January 14, 2018. On February 12, 2018,

Defendant paid $3,000 to Plaintiff and the note's maturity date was extended until April 16,

2018. On May 4, 2018, Defendant paid $1,200 to Plaintiff and the note's maturity date was

extended until July 16, 2018. Defendant failed to pay the note at maturity.

Unfortunately, Hill could not satisfy his obligation on the dishonored checks. On

February 16, 2018, Hill signed a promissory note in the amount of $1,046,328 in favor of

Defendant for seven Loan Agreements dated December 1, 5 and 7, 2017, that Hill had failed to

repay. Defendant contacted Hill almost every day from February 16 until mid April, 2018, asking

when he was going to pay Defendant. Hill would say he had money coming the next week. On

---

time to the other bank to see if it will clear.

[12]This reduced Defendant's overdraft to about $397,000.

April 12, 2018, Defendant filed suit against Hill in the Superior Court of Oglethorpe County, Georgia. This suit was stayed when Hill filed Chapter 7 bankruptcy on May 10, 2019.

On July 3, 2018, Defendant filed suit against Plaintiff in the Superior Court of Oglethorpe County, Georgia, asserting claims for breach of contract, negligence and attorney fees. Plaintiff filed an answer and counterclaim seeking judgment on three notes in the original principal amounts of $40,000, $152,592.67 and $397,077.07 which were in default.[13] On January 25, 2021, the Superior Court granted Plaintiff's motion for summary judgement, dismissed Defendant's claims against Plaintiff, and entered judgment for Plaintiff against Defendant on the notes plus interest and statutory attorney fees.[14]

### CONCLUSIONS OF LAW

As previously stated, Plaintiff alleges that Defendant's debt to Plaintiff was incurred as a result of a check-kiting scheme and that his debt is non-dischargeable under 11 U.S.C. § 523 (a)(2)(A). That Code section provides, in relevant part, that a debt for money or an extension, renewal or refinancing of credit is, to the extent obtained by actual fraud, nondischargeable in an individual debtor's case.[15] Actual fraud "consist of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another." Dewitt v. Stewart

---

[13]The notes for $40,000 and $152,592.67 are not at issue in this adversary proceeding.

[14]The evidence established that as of October 21, 2022, the day of trial of this adversary proceeding, the balance owed on the judgment amount relating to the note on the overdraft, including postjudgement interest, totaled $519,584.50.

[15]Plaintiff makes no claim of nondischargeability for false pretenses or false representation under 11 U.S.C. §523(a)(2)(A).

(In re Stewart), 948 F.3d 509, 521 (1ˢᵗ Cir. 2020) (quoting 4 Collier on Bankruptcy §523.08

[1][e] (16ᵗʰ ed. 2015)). In Husky Int'l Elecs., Inc., v. Ritz, 578 U.S. 356, 136 S. Ct. 1581, 194 L.

Ed. 2d 655 (2016), the Supreme Court stated:

> This Court has historically construed the terms in §523 (a)(2)(A) to contain the "elements
> that the common law has defined them to include." "Actual fraud" has two parts: actual
> and fraud. The word "actual" has a simple meaning in the context of common-law fraud:
> It denotes any fraud that "involv[es] moral turpitude or intentional wrong." "Actual"
> fraud stands in contrasts to "implied" fraud or fraud "in law," which describe acts of
> deception that "may exist without the imputation of bad faith or immorality." Thus,
> anything that counts as "fraud" and is done with wrongful intent is "actual fraud."
> Although "fraud" connotes deception or trickery generally, the term is difficult to define
> more precisely.

578 U.S. at 360 (internal citations omitted)

Determining fraudulent intent often depends largely on an assessment of the credibility

and demeanor of the debtor and because a debtor rarely admits fraudulent intent, courts look to

the totality of circumstances to make that determination. BMO Harris Bank v Richert (In re

Richert), 632 B.R. 877, 894 (Bankr. M.D. Fla. 2021).

Plaintiff has the burden to prove by a preponderance of the evidence : (1) that Defendant

committed actual fraud, (2) that Plaintiff relied on Defendant's conduct, (3) that its reliance was

justifiable, and (4) that Defendant caused its loss. Harris v. Jayo (In re Harris), 3 F.4th 1339,

1344 (11ᵗʰ Cir. 2021)

Plaintiff asserts that Defendant and Hill engaged in check kiting by swapping checks in

order to create artificial balances in their checking accounts. Check kiting has been defined as

follows:

> Check kiting consists of drawing checks on an account in one bank and depositing them
> in an account in a second bank when neither account has sufficient funds to cover the
> amounts drawn. Just before the checks are returned for payment to the first bank, the kiter

covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the "float" time, an artificial balance is created.

United States v. Stone, 954 F.2d 1187, 1188 n.1 (6th Cir. 1992) "Check kiting is the practice of writing a check against a bank account where funds are insufficient to cover it and hoping that before it is presented for payment to the payor bank, covering deposits (either real or feigned) will have been made. In effect, to kite a check is to use a bad check to temporarily obtain credit." Regions Bank v. Kaplan, 2021 WL 4852268 *1, n. 2 (11th Cir. Oct. 19, 2021)(quoting United States v. Morales, 978 F.2d 650, 653 n. 6 (11th Cir. 1992)). " The bank left holding dishonored checks is the victim of the scheme as it is the bank who suffers the loss...." Welch v. Regions Bank (In re Mongelluzzi), 591 B.R. 480, 491 (Bankr. M.D. Fla. 20218).

Several courts have held that a check kiting scheme is actual fraud within the meaning of §523(a)(2)(A). See Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 878 (B.A.P. 6th Cir. 2001) (check kiting is actual fraud; Sixth Circuit has held that check kiting is a scheme or artifice to defraud a financial institution under federal bank statute) (citing United States v. Stone, 954 F.2d 1187, 1190 (6th Cir. 1992)); Vectra Bank Colo., N.A. v. Winger (In re Winger), 381 B.R. 417, at* 3 (B.A.P. 10th Cir. 2008) (affirming bankruptcy court that held bank had established a check-kite, that check kite is actual fraud within meanings of §523(a)(2)(A), but that is was debtor's husband and not debtor who acted with requisite fraudulent intent); Murphy v. Spencer (In re Spencer), 541 B.R. 750, 757 (Bankr. D. N.M. 2015) (actual fraud includes check kiting scheme) In re Woodard, 2009 WL 4639648, at* 3 (Bankr. S.D. Tex. Dec. 7, 2009) (criminal conduct of debtor in check kiting scheme was nondischargeable actual fraud under §523 (a)(2)(A)).

10

Turning to the case at bar, Plaintiff argues that Defendant participated in a check kiting scheme that collapsed and that Hill's scheme could not work without Defendant being an accomplice passing checks back to Hill.  Defendant argues that he was a victim in a scheme contrived and conducted by his long-time friend and former roommate, Jake Hill.

As the case law explains, a check kiting scheme is kept alive by the float created by the constant swapping of checks. Thomas explained that when a check is dishonored, Plaintiff usually presented it a second time, thus creating a float of approximately seven days.

Assuming a seven day float, the facts establish that, for the majority of the time during which Defendant and Hill dealt with each other, there was no check kiting. Specifically, the Loan Agreements and Defendant's bank statements establish that, until the end of November 2017, there were a number of times during which there was no activity between Defendant and Hill for more than seven days and yet no checks were returned. For instance, there were several loan checks from Defendant and repayment checks from Hill between August 1 and August 9, 2017. The final transactions during this period of time included a loan check of $25,000 by Defendant to Hill which was charged against Defendant's bank account on August 7. The next day, August 8, Defendant loaned Hill another $15,000 and, on that same date, Defendant deposited into his account a loan repayment check from Hill of $5,200. The loan check of $15,000 was charged to Defendant's account on August 9. After that, there were no additional loans to Hill or repayments from Hill until August 23.[16] Thus, there were thirteen days during which no activity occurred, providing sufficient time, assuming a seven day float, for all of the transactions between August

---

[16]Because the "float" does not begin until an item is either debited or credited against Defendant's bank account, the Court has used the debit and credit dates as shown on Defendant's bank accounts, rather than the dates on which checks were written.

1 and August 9 to clear the bank accounts of Defendant and Hill. Had Defendant and Hill been

swapping worthless checks, as alleged by Plaintiff, the scheme would have collapsed during this

thirteen day period because the "float" would have run its course and any worthless checks would

have been returned. Since all of the checks cleared, it is beyond dispute that, for the transactions

between August 1 and August 9, legitimate checks were being exchanged and cleared. Thus,

during that period of time, there was no check kiting.

Similarly, transactions between August 23 and August 28 were followed by an nine day

gap in which no transactions occurred and no checks were returned. The transactions between

September 7 and September 12 were followed by a period of nine days during which no

additional transactions took place and no checks were returned. Again, the transactions between

September 22 and October 2 were followed by a period of nine days during which no

transactions occurred and no checks were returned. Finally, the transactions between October 12

and November 13 were followed by ten days during which no additional transaction occurred and

no checks were returned. In summary, until the end of November 2017, there were gaps between

transactions during which there was no float and no returned checks. Thus, there was no check

kiting scheme going on during that period of time.

That leaves the transactions between November 24, 2017, and December 15, 2017, when

Hill's $550,000 deposits into Defendant's account were dishonored and returned. Between those

dates, Defendant loaned Hill $1,499,000 in 13 transactions[17] and Hill made repayments of

$1,664,625 in 15 transactions. Clearly, the number and amounts of those transactions suggest that

---

[17]On December 7, four loan agreements were signed by Hill and Plaintiff issued the
$535,000 cashier's check on December 8, 2017.

12

a kiting scheme was occurring. Defendant admitted that he became suspicious towards the end of

the relationship. However, because Hill was a long time  friend and their past transactions had

been successful, he continued the relationship. Given the fact, as explained above, that there had

been significant periods of time from August 2017 to the end of November 2017 during which

the facts show no kiting was occurring, the Court finds that Defendant's reliance was reasonable.

Further, Defendant testified that he knew, from a prior transaction, that if the bank issued

a cashier's check to Hill and Hill's deposit was not honored, thus leaving insufficient amounts in

Defendant's account to cover the cashier's check, Defendant would be liable. So, he testified

that, before asking Plaintiff to issue the $535,000 cashier's check, he called the bank and spoke

to Sheryl Clark. He testified that when she said, "we can do it", he understood that to mean that

Hill's deposits had cleared.[18] The Court is persuaded that, at least in Defendant's mind, there was

no attempt to defraud Plaintiff.

This case is very similar to the case of Regions Bank v. Kaplan, 258 F.Supp.3d 1275

(M.D. Fla. 2017), aff'd 2021 WL 4852268 (11th Cir. Oct. 19, 2021).  In that case, Regions

asserted fraudulent concealment claims under Florida law against Kaplan arising from a check

kiting scheme. Kaplan was a businessman who understood the check collection process. Kaplan

made short-term loans to SSA so that SSA could supposedly take advantage of vendor discounts

for supplies by paying invoices before the due date. The loans were pitched to Kaplan as

investment opportunities. SSA would request that Kaplan wire money to its bank account to pay

the invoices up front at discount, and then pay back the loan to Kaplan, splitting the discount

---

[18]Although Thomas testified that, in December 2017, the bank did not have the ability
to determine whether Hill's checks had cleared, there was no evidence that Defendant was
aware of this.

amount as interest on the loan. During a three year period, Kaplan completed hundreds of short-term loan transactions without problems until SSA's $12,000,000 repayment checks for a deal bounced.

The short term loans that SSA had offered Kaplan were completely fraudulent. The scheme was a Ponzi scheme designed to provide money to financially ailing SAA and to its principals. SSA's principals were sentenced, or awaiting sentencing, for imprisonment for federal mail and wire fraud offenses and ordered to pay restitution of about $57,000,000.  Regions claimed Kaplan knew about and fraudulently concealed the scheme, causing Regions to provide immediate credit for SSA's check deposits that were subsequently dishonored.

At the bench trial, Regions expert witness confirmed a pattern of check kiting between SSA and Kaplan, but testified it was not possible to tell by looking at Kaplan's account statements whether SSA's checks were supported by sufficient funds without knowledge of SSA's account balances. Id. at 1290. Regions argued that no legitimate investment or loan had the unusually high rate of return that the short term loans to SSA offered, and that Kaplan knew that the transactions were not legitimate. Id. Regions also argued that Kaplan knew or turned a blind eye to the fact that SSA's checks deposited into his account were not supported by funds in SSA's account.

Under Florida law to prove fraudulent concealment, Regions had to show, in part, that Kaplan concealed or failed to disclose a material fact that he knew should be disclosed and that such concealment or failure to disclose induced Regions to act and suffer damages. Id. at 1292. Region's fraudulent concealment was based on its allegations that Kaplan knew he was check kiting with SSA.

14

The district court noted that the account records showed that many transactions between Kaplan and SAA were executed without any problems. Kaplan testified " I just knew I was making money, and I was going with it.... Everything was going well, was going smooth. Was making money. I was fat, dumb, and happy so to speak." Id. at 1294. The district court found no evidence that Kaplan had actual knowledge that the transactions were not legitimate in the sense that he had actual knowledge of the Ponzi scheme executed by SSA, or that the transactions were carried out in furtherance of the Ponzi scheme.

The district court noted that Kaplan had no direct contact with SSA's bank and never knew the balance in SSA's account at any particular time. Kaplan had completed many deals with no problems in the check collection process and he was guided by the history of the deals with SSA which were successfully executed. Id at 1294-95. The district court held that Regions had not established the knowing and intentional participation in check kiting between Kaplan's accounts at Regions and SSA's bank account. Id. at 1296.  The Eleventh Circuit affirmed.

Similarly, in this case, the evidence establishes that Defendant and Hill successfully completed many transactions during which no check kiting occurred. To the extent that check kiting occurred at the end of the relationship, Plaintiff has introduced no evidence to show that Defendant was a knowing participant.

Plaintiff also argues that Defendant had insufficient income and personal wealth to make the hundreds of thousands of dollars of loans to Hill, suggesting that the loan funds had to come from a check kite. However, Defendant opened his account with Plaintiff on June 9, 2017 with an initial balance of $200. Between June 9 and June 27, Defendant received and deposited into this account loan repayments from Hill of $31,500 on two "older" loans. In addition, Defendant

15

borrowed $40,000 from Plaintiff from which $30,000 was deposited into his account on June 27.

Thus, Defendant's account balance was about $61,500 when he made the first loan of $30,000 to

Hill on June 27. From then and until the end of November, 2017, the account was growing by the

thirty percent profit Defendant was making on his loans and generating sufficient balances to

finance the loans.

Plaintiff argues that because Defendant received incredibly high returns on his loans, he

must have realized the scheme's fraudulent nature. Plaintiff argues that Georgia law criminalizes

"any rate of interest greater than five percent per month."[19] Further, Thomas testified that

commercial loans for working lines of credit generally had interest rates of six percent to seven

percent per annum. However, Defendant testified that the thirty percent came from the thirty

percent mark up on materials, which he understood was common in the industry. Whether or not

a thirty percent mark up is common, there was no evidence to show that Defendant did not

honestly believe this. Nor was there any evidence to show that Defendant was aware that this rate

of return was illegal.

Shortly before the publishing of this decision, Plaintiff filed a supplemental brief arguing

that under the recent decision by the Supreme Court in <u>Bartenwerfer v. Buckley</u>, 598 U.S.

_____, 2023 WL 2144417 (Feb. 22, 2023), Defendant can be held liable under §523 (a)(2)(A)

even if he did not personally commit the alleged fraud. However, Plaintiff has misconstrued

<u>Bartenwerfer</u>.

In <u>Bartenwerfer</u>, Kate and David Bartenwerfer decided to remodel a house they jointly

owned and to sell it for profit. David was solely involved in the renovations. After the repairs, the

---

[19]<u>See</u> O.C.G.A §7-4-18.

16

house was placed on the market and sold to Buckley. In conjunction with the sale, Kate and

David attested that they had disclosed all material facts about the house. However, after the

purchase, Buckley discovered numerous undisclosed defects, requiring repairs costing over

$200,000. He sued Kate and David, alleging that he had been damaged by his reliance on their

misrepresentations. The jury awarded him judgement against the Bartenwerfers for breach of

contract, negligence and nondisclosure of material facts. When the Bartenwerfers filed for

Chapter 7 bankruptcy, Buckley filed a §523 (a)(2)(A) complaint.

In defense, Kate argued that she had been unaware of any of the misrepresentations.

Accordingly, she argued that, since she did not knowingly make a false representation, her

obligation under the judgement was dischargeable. The Supreme Court disagreed. It held that the

wording of the statute only required that the debt arise from someone's fraud. However, once

fraud has been established, §523 (a)(2)(A) makes the debt non-dischargeable as to all who are

liable, regardless of whether or not they had participated in the fraud. The Court noted that

court's have traditionally held principals liable for the fraudulent acts of their agents and

individuals have been held liable for the frauds committed by their partners within the scope of

the partnership.

> Understanding §523(a)(2)(A) to reflect the passive voice's usual "agnosticism" is thus
> consistent with the age-old rule that individual debtors can be liable for fraudulent
> schemes they did not devise.

Id. at *5.

In the case at bar, Defendant's liability to Plaintiff does not arise from the fraud of

another for which he is vicariously liable. Rather, his liability is a direct liability on the note that

he signed to cover the overcharge to his account. Accordingly, Plaintiff had to prove that this

debt was incurred by actual fraud committed by Defendant. Nothing in <u>Bartenwerfer</u> changes this.

     In conclusion, the Court has considered the trial testimony and the evidence presented, including Defendant's deposition. The Court concludes that Plaintiff has failed to carry its burden of proving that Defendant knowingly participated in a check kiting scheme and committed actual fraud. Accordingly, the relief requested by Plaintiff in its complaint is denied and Defendant's debt to Plaintiff is dischargeable.

     A separate order and judgement consistent with this opinion shall be entered hereafter.

*END OF DOCUMENT*